SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of:<br><br>ADULT USE HOLDINGS INC. and<br>ZOLA VENTURES LTD.,<br><br>         Petitioners,<br><br>     -against-<br><br><br>FAZE CLAN INC.,<br><br>         Respondent. | Index No.<br><br>**PETITION TO VACATE OR<br>MODIFY PARTIAL FINAL<br>ARBITRATION AWARD** |

1. Petitioners Adult Use Holdings, Inc. and Zola Ventures Ltd. (collectively, "Petitioners"), by and through their undersigned attorneys, submit this petition under CPLR § 7511(b) and Federal Arbitration Act §§ 9 and 10 to (1) vacate the Partial Final Award, dated August 4, 2021 (the "PFA"), in the matter before the American Arbitration Association captioned *Adult Use Holdings, Inc. and Zola Ventures Ltd. vs. Faze Clan, Inc*., Case No. 01-20-0015-8611 (the "Arbitration"); and (2) to remand to the Arbitration for further proceedings consistent therewith, as set forth below.

## II. INTRODUCTION

2. Petitioners are foreign finders, based in Canada, who introduced the prior management of Respondent Faze Clan, Inc. ("Respondent") to capital sources in Canada that funded Respondent with over $30 million in early-stage capital, helping propel it to a current valuation of over $1 billion. Prior management of Respondent agreed to compensate Claimants for their successful introductions, and in fact compensated them for one or more initial rounds of

1

financing. However, when a source referred by Claimants agreed to loan Respondent $30 million CAD, new management of Respondent repudiated the agreement, and refused to pay Claimants the compensation to which they expressly agreed.

3.    When Claimants commenced an arbitration of their claims in the American Arbitration Association, Respondent predictably contended that—although Claimants were pure foreign finders, who never negotiated with any potential investor—Claimants were barred from receiving transaction-based compensation because they are not registered brokers or dealers in the United States.

4.    To dispose of this argument at the outset, the parties and arbitrator agreed that Respondent could make a preliminary motion, under Rule 33 of the Commercial Arbitration Rules of the AAA, to dismiss Claimant's claims exclusively on regulatory grounds, under federal and state securities laws.

5.    Respondent made such a Rule 33 motion and Claimants opposed the motion. Ultimately, the arbitrator declined to rule on any of the regulatory arguments authorized by the parties. Instead, contrary to the expectations and understanding of the parties, and without any warning, the arbitrator found—prior to any discovery—that Respondent effectively was entitled to summary judgment on Claimants' claims based on contractual grounds expressly ***not*** submitted for adjudication on the Rule 33 motion.

6.    Although Claimants timely requested that the arbitrator vacate the purported Partial Final Award ("PFA"), the arbitrator found that he was barred from doing so under Commercial Rule 50, which codifies the *functus offico* doctrine. Under that doctrine, once a final award has been entered by an arbitrator, the arbitrator has no power to entertain any request to reconsider or modify the award. This was the sole basis of the arbitrator's decision.

7.    Under the recent decision of the Court of Appeals of New York in *Am. Int'l Specialty Lines Ins. Co. v. Allied Cap. Corp.,* 35 N.Y.3d 64, 71, 149 N.E.3d 33, 37 (2020), where, as here, the parties expressly have not submitted an issue for summary adjudication by an arbitrator, the *functus officio* doctrine does not apply, and the arbitrator is not barred from reconsidering a decision.

8.    This Court now should vacate the PFA because, in dismissing Claimants' claims on grounds beyond the agreed scope of the Rule 33 Motion, the arbitrator "exceeded his power" in violation of CPLR § 7511(b)(3).

9.    The Court further should vacate the PFA under CPLR § 7511(b)(4) on grounds that it was the result of an unfair procedure which denied Claimants a fair opportunity to present their evidence and argument, without prior warning.

10.   Alternatively, the Court should modify the PFA under § 7511(c)(2).

11.   At this stage, the PFA may easily be corrected without affecting the merits of the Arbitration going forward. The Court may simply remand the matter back to the arbitrator with instructions to allow discovery and adjudicate all matters—after a hearing—in a complete final award coextensive with all of the issues submitted by the parties.

### III.    STATEMENT OF FACTS

### A.    Respondent's New Management Repudiates the Parties' Commission Agreements

12.   Adult and Zola each are a foreign business entities, organized, respectively, under the laws of Canada and of the British Virgin Islands. *See* Exhibit 1, Statement of Claim ("SOC") ¶¶ 8-9. Salman and Gimelshtein each are citizens of Canada, not resident in the United States. *See* Exhibit 2, Procedural Order No. 1 ¶¶ 4-5.

#### 1.    *The Adult Use Commission Agreement*

3

13.     On or about, January 29, 2019, Adam Salman, the principal of Adult Use, visited the Company's offices in Los Angeles, California with his friend and business associate, an international disc jockey known as "DJ Mike." *See* SOC ¶ 16. While in the Company's offices, Mr. Salman met the Company's former President, Greg Selkoe. *See id.*

14.     Mr. Salman did not visit the Company to propose raising capital, but rather was there purely for social purposes. *See* SOC ¶ 17. Nevertheless, during the brief meeting, Mr. Selkoe proposed to Mr. Salman that, if he introduced the Company to prospective investors, the Company would pay a 5% commission for each successful transaction. *See id.*

15.     Following the meeting, Mr. Selkoe memorialized this promise on behalf of the Company in § 3 of a Referral Agreement with Adult Use (the "Adult Use Commission Agreement"), under which Faze (the "Client") agreed "to pay to the Referrer a referral commission . . . equal to five percent (5%) of the dollar amount of securities purchased by the referred party in connection with the Funding as a direct result of introductions first made by the Referrer." *See* SOC ¶ 18.

16.     Section 5 of the Adult Use Commission Agreement, a common "tail" provision, provides that "[i]n any case where the Client is contacted by one of the Referrer's sources directly after an introduction or referral has taken place, the Referrer will be entitled to their Commission on any transaction executed by the Client with the respective source; provided that (a) such source did not contact Client independently of Referrer's introduction and (b) less than two (2) years has passed since the Effective Date." *See* SOC ¶ 19.

                2.     *The Zola Commission Agreement*

17.     In or about March 2019, pursuant to the Adult Use Commission Agreement, Mr. Salman introduced Mr. Selkoe to Igor Gimelshtein, of Zola, who was a former employee of Canaccord, a Canadian financial services company based in Toronto. *See* SOC ¶ 20.

18.   On behalf of the Company, Mr. Selkoe orally agreed that, if Messrs. Salman and Gimelshtein successfully obtained funding for the Company by and through Canaccord, in addition to the commission due to Adult Use, Mr. Gimelshtein's company, Zola, also would receive a commission of 5% of the amount of the capital raised, upon the same terms as the Adult Use Commission Agreement (the "Zola Commission Agreement"). *See* SOC ¶ 21.

3.   ***Messrs. Salman and Gimelshtein Introduce Canaccord to the Company***

19.   On or about March 2, 2019, Mr. Gimelshtein advised Michael Kogan—a Managing Director at Canaccord who specializes in gaming and e-sports, with whom Mr. Gimelshtein previously had worked—about the possibility of raising capital for the Company. *See* SOC ¶ 22.

20.   In an email dated March 4, 2019, Messrs. Salman and Gimelshtein introduced Mr. Selkoe to Mr. Kogan, to arrange a teleconference to discuss a potential investment in the Series A Round by Canaccord and/or its investors. *See* SOC ¶ 24. Thereafter, in an introductory teleconference, on March 5, 2019 (the "Canaccord Introduction"), Messrs. Salman and Gimelshtein formally introduced Mr. Selkoe and the Company to Mr. Kogan and Canaccord. *See* SOC ¶ 25. Following the introduction, neither Mr. Salman nor Mr. Gimelshtein had any further involvement with the potential transaction, except to pursue and ensure payment of their due commissions.

4.   ***The Company Memorializes the Zola Commission Agreement***

21.   Following the Canaccord Introduction, in an email dated March 6, 2019, Mr. Selkoe, on behalf of the Company, stated to Mr. Gimelshtein "I was pleased to hear your group (family offices) plans to take the remaining $4mm of the note in FaZe Clan. Per our discussion we are comfortable paying you 5% commission on money raised to be paid in stock (warrants, whatever is most advantageous for tax purposes) or cash or a combination of both at your election." *See* SOC ¶ 27.

5

22. As confirmed by the parties' subsequent conduct, such 5% commission upon investments by and through Canaccord was in addition to the 5% commission payable by the Company to Adult Use. *See* SOC ¶ 28.

5. ***Canaccord Insists Upon a Right of First Refusal to Lead a Subsequent Transaction***

23. In an email dated March 14, 2019, Mr. Kogan advised Mr. Selkoe that Canaccord wanted to lead an anticipated subsequent much larger financing round. *See* SOC ¶ 30. Specifically, Mr. Kogan requested that the Company give Canaccord a right of first refusal ("ROFR"), which would entitle it to do so if Canaccord was successful in completing the Series A Round. *See id.* In the same email, Mr. Kogan acknowledged that "Adam/Igor . . . did introduce you to our firm and we are very grateful for this." *Id.*

24. Initially, the Company declined to grant Canaccord the proposed right of first refusal. *See* SOC ¶ 31. However, in an email dated March 26, 2019, Mr. Kogan advised the Company's General Counsel, Phil Gordon, that "[t]he whole reason we are doing this is for the ROFR." *See id.* Ultimately, after further negotiation between the Company and Canaccord, on April 6, 2019, the parties entered into a letter agreement granting Canaccord a ROFR to serve as the lead financial advisor in connection with a number of potential transactions, including a financing of over $25 million, upon the condition that Canaccord successfully raise funds and close out the Series A Round. *See* SOC ¶ 32.

5. ***Canaccord Successfully Closes the First Transaction***

25. Canaccord successfully procured investors sufficient to close out the Series A Round, triggering its rights under the ROFR. *See* SOC ¶ 33. In the "First Transaction," which closed on or about December 24, 2019, Canaccord and its investment partners purchased a total of $5,335,000 in the Series A convertible debt of the Company. *See* SOC ¶ 34. Neither Adult Use nor

Zola was in any way involved in negotiating the terms of the First Transaction.

26. Consistent with the Company's agreements, in July and August 2019, the Company paid each of Adult and Zola its due 5% commission in connection with the First Transaction. *See* SOC ¶ 35.

### 6. *Canaccord and the Company Secretly Complete a Loan Facility with Bridging Finance, Inc.*

27. Pursuant to the terms of the ROFR, Faze and Canaccord secretly proceeded to negotiate a second, $30,000,000 CAD convertible loan facility (the "BFI Loan" or "Second Transaction"), in partnership with Bridging Finance, Inc. ("BFI"), also of Canada, in connection with which the Company was valued at over $220,000,000. *See* SOC ¶ 37.

28. Recognizing that, under the plain language of § 5 of the Adult Use and Zola Commission Agreements, Adult Use and Zola were entitled to 5% commissions in connection with such a subsequent transaction "executed by the [Company] with the respective source," Canaccord, occurring within two years of the agreements, the Company and Canaccord intentionally concealed the BFI Loan from Messrs. Salman and Gimelshtein, who did not learn of it until it was publicly announced. *See* SOC ¶ 38.

### 7. *The CEO of Bridging Finance, Inc. is and Investment Partner in the First Transaction*

29. Not detailed in Claimant's Statement of Claim is the fact that among the "investment partners" procured in the First Transaction was David Sharpe, the CEO of BFI, *see* Exhibit 3, who purchased 11,134 Series A units for $101,238.36, and received a seat on the Board of Directors of the Company. *See* Exhibit 4, Series A Preferred Stock Purchase Agreement ¶ 4.5 and Exhibit A. In particular, the grant to Mr. Sharpe of a board seat strongly indicates that, at the time of the First Transaction, the Company contemplated a significant role for Mr. Sharpe and BFI in the future. Discovery in this matter may establish that, at the time of the First Transaction, Mr.

Sharpe and BFI already had begun substantial discussions with Canaccord and the Company concerning the terms of the Second Transaction.

**B.     Claimants Commence the Arbitration**

30.     On November 24, 2020, Claimants commenced arbitration proceedings before the American Arbitration Association, captioned *Adult Use Holdings, Inc. and Zola Ventures Ltd. vs. Faze Clan, Inc.,* Case No. 01-20-0015-8611, to enforce the payment terms of the Adult Use and Zola Commission Agreements in connection with the BFI Transaction. *See* SOC at 10. In its answer and counterclaims, Respondent argued that Claimants are not entitled to receive transaction-based compensation in connection with the introduction of Canaccord, primarily on grounds that neither of Claimants is a broker/dealer registered with FINRA. *See* Exhibit 5. In addition to defending Claimants' claims, Respondent counterclaimed against both Claimants for the return of all compensation which Respondent's prior management had voluntarily paid to Claimants in connection with introductions of potential investors. *See id.*

**C.     The Parties Agree that Respondent Will Make a Rule 33 Motion Exclusively on its Regulatory Defenses**

31.     Prior to the initial teleconference with the Arbitrator, Respondent indicated that it intended to file a motion to dismiss, under Rule 33 of the Commercial Rules solely on grounds that Claimants' claims are barred on regulatory grounds by federal and state securities law (the "Rule 33 Motion"). Consistent with these discussions, in an email dated April 26, 2021, Respondent's counsel wrote the Arbitrator as follows:

> As you may recall, Respondent's answer indicated that Respondent would seek leave to make a dispositive motion under Rule 33. One of Respondent's defenses is that the federal securities laws and state blue sky laws prohibit Respondent from paying unregistered broker-dealers. Claimants' position is that they fall within exemptions to those prohibitions.

> ***The Parties have agreed that the most efficient and economical way to proceed in this arbitration would be for you to resolve that legal question as a preliminary matter, and we have agreed upon the following briefing schedule for doing so:***
>
> - May 14, 2021 – Respondent's Rule 33 Motion to Dismiss
>
> - June 11, 2021 – Claimants' opposition to Respondent's Rule 33 Motion to Dismiss
>
> - June 25, 2021 – Respondent's Reply to Claimants' Opposition
>
> However, the Parties were unable to agree as to whether any document exchange, to the extent any is necessary, should proceed in parallel to the briefing of the Rule 33 dispositive motion or whether it should wait until after resolution of Respondent's Rule 33 motion.

Exhibit 6 (emphasis added).

32.   Thereafter, during the initial teleconference in the Arbitration, on April 28, 2021, the Arbitrator determined to hear Respondent's Rule 33 Motion, exclusively on their announced regulatory defenses under federal and state securities law, prior to proceeding with discovery.

33.   By email, dated May 7, 2021, counsel to Respondent advised the Arbitrator that the parties had reached an agreement on the law governing the Referral Agreement and the parties' separate Arbitration Agreement. *See* Exhibit 7. Consistent with the parties' understanding concerning the limited nature of the Rule 33 Motion, Respondent stated "[t]o the extent that the Parties' claims or defenses rely on any other instrument or contract, then the Parties will address the law applicable to such instruments or contracts ***in any written submissions on the merits if the case should proceed to that stage****." Id.* (emphasis added).

34.   Finally, in Procedural Order No. 1 ("PO1"), dated May 12, 2021, the Arbitrator set forth a briefing schedule for the Rule 33 Motion, in which Respondent's opening submission was due on May 14, 2021, Claimant's opposition submission was due on June 11, 2021, and

Respondent's reply submission was due on June 25, 2021. *See* Exh. 2. PO1 did not authorize any other submission by either Claimants or Respondents. *See id.*

### D. As Agreed, Respondent Makes its Rule 33 Motion on Exclusively on its Regulatory Defenses

35.     On May 14, 2021, Respondent filed the opening submission in its Rule 33 Motion. *See* Exhibit 8. In it, consistent with the parties' clear understanding, in its opening submission, Respondent argued exclusively that Claimants are not entitled to receive commissions because they are not registered securities brokers. After prefacing that it also disputed Claimants' arguments on contractual grounds, in paragraph 3 of its memorandum of law, Respondent expressly stated that "[t]he Tribunal need not ever reach those issues, however, because Claimants' claims are subject to dismissal as a matter of law for the reasons set forth in this Rule 33 motion." *Id.* ¶ 3. Articulating the "reasons set forth in the Rule 33 motion," Respondent continued:

> Both federal securities law and applicable California state securities laws—the latter known as California "Blue Sky" laws—prohibit the payment of transaction-based commissions to unregistered securities brokers, like the Claimants, and those same laws provide that any contracts to pay such unlawful commissions are void and unenforceable. ***Even assuming the facts as pled by Claimants, FaZe Clan is prohibited under applicable securities laws from paying Claimants as requested and any agreement which purports to provide for any such payment is void and unenforceable.***

*Id.* (emphasis added).

36.   Respondent thus made crystal clear that, as agreed by the parties and the Arbitrator, its Rule 33 Motion was purely a motion, as a matter of law, based on its regulatory defenses. *See id.* Nowhere in its opening submission did Respondent argue that Claimants are not entitled to fees based upon the language of the Referral Agreement or Zola Agreement. *See id.*

### E. Claimants Oppose Respondent's Regulatory Defenses

37.     On June 11, 2021, Claimants filed their submission in opposition to Respondent's

Rule 33 Motion. *See* Exhibit 9. In it, Claimants appropriately addressed only Respondent's regulatory arguments under federal and state securities law. Claimants had no reason or occasion to address any contractual or other argument by Respondent, which Claimants understood were to be adjudicated—after appropriate discovery—during the arbitration hearing already scheduled in PO1.

### F.   Respondent Presents a New Argument, Beyond the Scope of the Rule 33 Motion, in its Reply Submission

38.   Recognizing the merit of Claimant's response to its regulatory arguments, in its reply submission, Respondent improperly sought to argue factual matters beyond the agreed scope of the Rule 33 Motion, including that—as a matter of fact—Claimant's did not refer the source of the Second Transaction. *See* Exhibit 10. Under traditional principles of practice in state and federal courts—which were no less applicable in the arbitral forum—Respondent was prohibited from introducing any new or different argument in its reply, and the arbitral tribunal should not have considered any argument beyond the scope of Respondent's initial submission.

### G.   The Arbitrator Issues the Purported Partial Final Award, Based Upon the

39.   On August 4, 2021, the Arbitrator issued a decision on the Rule 33 Motion, which he styled a "Partial Final Award" (the "PFA"). *See* Exhibit 11. However, this was contrary to the expectations of the parties, which never agreed—in PO1 or elsewhere—that the Rule 33 Motion would result in a "partial final award."

40.   In the PFA, the Arbitrator expressly declined to grant the Rule 33 Motion on regulatory grounds—the only grounds upon which the parties and arbitrator agreed as bases for the Rule 33 Motion. Instead, contrary to the agreement and expectations of the parties, the Arbitrator found that Claimant's claims should be dismissed outright based upon "the clear language of Paragraph 5" of the Referral Agreement. *See* PFA ¶ 122. The PFA reasoned as follows:

Section 3 of the Referral Agreement requires payment of a 5% commission "of the dollar amount of securities purchased by the referred party in connection with the Funding as a direct result of introductions first made by the Referrer." *Id.* ¶ 120.

While the First Transaction would seem to satisfy these requirements, the Bridging Transaction does not. Canaccord, not Bridging Finance, Inc., is the "referred party" required to make the "purchase" and this language clearly does not extend to the Bridging Transaction." *Id.* ¶ 121.

41.   Had Claimants been on notice that the Arbitrator might decide the Rule 33 Motion other than on regulatory grounds, Claimants could have presented additional facts and argument concerning the meaning of § 5 of the Referral Agreement and Zola Agreement which demonstrate that, at a minimum, there are issues of fact concerning whether Claimants procured BFI as an lender. Specifically, among the "investment partners" procured in the First Transaction was David Sharpe, the CEO of BFI, *see* Exh. 3, who purchased 11,134 Series A units for $101,238.36, and received a seat on the Board of Directors of the Company. *See* Exh. 4, Series A Preferred Stock Purchase Agreement ¶ 4.5 and Exhibit A. In particular, the grant to Mr. Sharpe of a board seat strongly indicates that, at the time of the First Transaction, the Company contemplated a significant role for Mr. Sharpe and BFI in the future.

42.   These facts, and others which Claimants expected to develop in discovery, support the inference that Claimants referred the source of the Second Transaction.

**H.    Claimants Timely Request that the Arbitrator Vacate of Modify the Partial Final Award**

43.   By letter dated August 8, 2021, Claimants requested that the Arbitrator (1) vacate the Partial Award; (2) deny Respondent's Rule 33 Motion to Dismiss; and (3) allow discovery to proceed, among other things, concerning the participation of the CEO of Bridging Finance, Inc. ("BFI"), David Sharpe, in the First Transaction, which confirms that BFI was a funding source subject to the tail in § 5 of the Referral Agreement." Exhibit 12.

44.  In their application, Claimants explained:

> In the Partial Award, you declined to grant the Rule 33 motion on regulatory grounds. Instead, you granted the motion on grounds that Claimants were not entitled to a recovery based upon "the clear language of Paragraph 5" of the Referral Agreement. *See* Partial Award ¶ 122. However, this issue was not within the scope of Respondent's initial motion. Had Claimants been on notice that you might decide the Rule 33 motion other than on regulatory grounds, Claimants would have presented additional facts and argument concerning the meaning of § 5 of the Referral Agreement and Zola agreement which mandate a different result.
>
> * * *
>
> Paragraph 120 of the Partial Award states that "the First Transaction would seem to satisfy the requirements" of § 3 of the Referral Agreement, entitling Claimants to a fee. *See* Partial Award ¶ 120. However, paragraph 120 continues that "the Bridging Transaction does not." *See id.* In view of the foregoing additional facts, which Claimants did not have notice and an opportunity to submit in connection with Respondent's Rule 33 Motion, there is, at a minimum, an issue of fact concerning whether the procurement of Mr. Sharpe as a "source" by Claimants and Canaccord in the First Transaction entitles Claimants to a fee on the Second Transaction—which unquestionably was done "with" both Canaccord and Sharpe, through his business entity, BFI, within the meaning of § 5 of the Referral Agreement. There is reason to believe that there is substantial further evidence in the possession of the Company, Canaccord and BFI that will demonstrate Claimants' right to a fee in connection with the Second Transaction. For example, Respondent has never disclosed whether Canaccord itself participated in some degree in the Second Transaction. Thus, the dismissal of Claimant's claims at the pleading stage is inappropriate.
>
> Even if Mr. Sharpe had not made a substantial investment in the First Transaction and had not received a board seat, the language of § 5 of the Referral Agreement is broad enough to entitle Claimants to a fee in the Second Transaction, because it was executed "with" Canaccord, which—as in the First Transaction—played a material role in the transaction as the Company's financial advisor. The term "with" in § 5 is broad enough to include not only a contractual counterparty, but also an agent acting on behalf of the Company— in this case its financial advisor. In view of the Company's conduct in the First Transaction, in which it paid Claimants for a transaction in which Canaccord served as the Company's financial advisor, there is no basis for distinguishing the Second Transaction, in which

> Canaccord also served as the Company's financial advisor (pursuant to a ROFR procured on Claimants' watch). *See Waverly*, 48 A.D.3d at 265, 851 N.Y.S.2d at 179.

*Id.*

45. In response, Respondent argued, primarily, that the Arbitrator was barred from revisiting the PFA under Rule 50 of the Commercial Rules, which states, in relevant part, that "[t]he arbitrator is not empowered to redetermine the merits of any claim already decided." Respondent also contended—contrary to the objective facts—that its Rule 33 Motion in fact encompassed, and was meant to encompass, arguments other than Respondent's regulatory arguments. *See* Exhibit 13. Respondent did not dispute Claimant's factual showing that Sharpe participated in the First Transaction. *See id.*

46. By letter dated August 12, 2021, Claimants replied in further support of their request to vacate or modify the PFA. *See* Exhibit 14. Claimants cited law establishing that they had a right to expect that the Rule 33 Motion would be limited to Respondent's regulatory defenses and had strong grounds to vacate the PFA in court. *See, e.g., Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (vacating arbitration award on grounds of procedural unfairness).

## I.     The Arbitrator Declines to Vacate or Modify the Partial Final Award

47. On August 20, 2021, the Arbitrator issued Procedural Order No. 2 ("PO2"), which denied Claimants' request to vacate or modify the PFA. *See* Exhibit 15. The Arbitrator's sole basis for declining to vacate the PFA was that he was forbidden to do so under Rule 50 of the Commercial Rules. *See id.* ¶¶ 23-24. PO2 stated, in relevant part:

> 23. The Commercial Rules, which are deemed to have been made part of their arbitration agreement, do not permit a Tribunal to revisit the merits of a case after the issuance of a final award irrespective of whether it is a partial final award or a final award. The language of Rule 50 is clear that "[t]he arbitrator is not empowered to redetermine the merits of any claim already decided."

14

> 24. ***The merits of Claimants' claims have already been decided in the Partial Final Award and cannot be revisited by way of a request by Claimants for me to vacate the Partial Final Award. Such relief is clearly outside the scope of Rule 50 of the Commercial Rules.***

*Id.* (emphasis added).

## IV.   ARGUMENT

48.     Under New York CPLR § 7511, a party to an arbitration may petition a court to vacate or modify the award on a number of grounds.[1] N.Y. C.P.L.R. 7511 (McKinney 2021). CPLR § 7511(b) provides that a court may vacate an arbitration award "if the court finds that the rights of that party were prejudiced," among other grounds, because: . . . (3) "an arbitrator, or agency or person making the award exceeded his power;" or (4) "failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection." *Id.* § 7511(b). Alternatively, under § 7511(c)(2), a court may modify an arbitration award if "the arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted." *Id.* § 7511(c)(2).

49.   As set forth below, ample bases exist for the Court to vacate or modify the PFA on each of these grounds.

**B.     The Partial Final Award Should Be Vacated Under CPLR § 7511(b)(3) Because, in Dismissing Claimants' Claims on Grounds Beyond the Agreed Scope of Respondent's Rule 33 Motion, the Arbitrator Exceeded His Power**

---

[1] Such motion may be made within ninety days of the completion of service of the award, which under CPLR § 2103(b)(2) occurs five days after receipt by mail. *See* N.Y. C.P.L.R. 7511 (McKinney 2021) (stating motion "may be made by a party within ninety days after its delivery to him"); N.Y. C.P.L.R. 2103 (McKinney 2021) (stating "five days shall be added to the prescribed period if the mailing is made within the state"); *Milk Wagon Drivers & Dairy Emps. v. Elmhurst Dairy, Inc.,* 14 F. Supp. 3d 90, 95 (E.D.N.Y. 2014) (finding ninety-day statute of limitations begins to run five days after receipt of award by mail).

50.     This Court first should vacate the PFA because, in dismissing Claimants' claims on grounds beyond the agreed scope of the Rule 33 Motion, the Arbitrator "exceeded his power" in violation of CPLR § 7511(b)(3).

51.     In declining to vacate the PFA, the Arbitrator relied exclusively on the *functus officio* doctrine, as codified in Rule 50 of the Commercial Rules, which holds that once an arbitration tribunal has issued a final award, it is without any power to reconsider or modify the award. *See Am. Int'l Specialty Lines Ins. Co. v. Allied Cap. Corp.,* 35 N.Y.3d 64, 71, 149 N.E.3d 33, 37 (2020) (stating, "under the common law rule, arbitrators relinquish all powers over the parties to the arbitration upon issuance of a final award and, therefore, are precluded from modifying or reconsidering that award").

52.     However, as the Court of Appeals of New York confirmed just last year, in *Am. Int'l Specialty Lines*, the *functus officio* doctrine applies only to an arbitration award that is *final—i.e.*, an award that is "coextensive with the issues submitted to the arbitrators by the parties." *Id.* [2] As the Court of Appeals found, "under our case law, a final arbitration award is *generally one that resolves the entire arbitration*." *Am. Int'l*, 35 N.Y.3d at 72, 149 N.E.3d at 38 (emphasis added).

53.     The PFA did not resolve "all of the issues submitted to the arbitrators by the parties." *See id.* Thus, under this clear standard, it was not a final award. Because the PFA was not final, neither the *functus officio* doctrine, nor Rule 50 of the Commercial Rules, were appropriate grounds upon which to decline Claimants' letter motion to vacate. *See id.* (finding arbitration panel was entitled to revisit and correct partial final award).

54.     Some federal courts have found an exception to this rule, where the parties expressly

---

[2] *See Mobil Oil Indonesia Inc. v. Asamera Oil (Indonesia) Ltd.,* 43 N.Y.2d 276, 281, 372 N.E.2d 21, 23 (1977) (finding interlocutory order did not constitute a final award on all issues submitted to arbitrators).

agree that there shall be a partial final award on a specific issue. *See id.* (citing *Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991)). In such a case, the arbitrator may make an award within the scope of the express authority granted by the parties according to their "mutual understanding." *See id.*

55.   In *Am. Int'l Specialty Lines*, the Court of Appeals found that the parties, by their express conduct, had not mutually authorized the panel of arbitrators to issue a partial final award on the validity of an insurer's denial of coverage, separate and apart from a determination of damages. *See id.* at 35 N.Y.3d at 72, 149 N.E.3d at 38. Thus, the panel was not precluded, under the doctrine of *functus officio*, from later reconsidering the partial final award—which had found that the insurer appropriately denied coverage—and issuing a corrected final award which reversed that decision. *See id.*

56.   Here, the parties agreed that the Arbitrator would entertain a Rule 33 Motion. However, it is crystal clear that, by the express agreement of the parties, the Rule 33 Motion was limited exclusively to Respondent's regulatory arguments under federal and state securities laws. As in *Am Int'l Specialty Lines*, there was no mutual agreement by the parties that the Arbitrator could issue a partial final award on any other topic. *See id.* In deciding the PFA other than on regulatory grounds, the Arbitrator exceeded the express authority granted to him by the parties. Accordingly, the PFA should be vacated on grounds that it violated CPLR § 7511(b)(3).

**C.    The Partial Final Award Should be Vacated Because the Arbitrator Denied Claimants a Fair Opportunity to Present Evidence and Argument in Violation of CPLR § 7511(b)(4)**

57.   The Court further should vacate the PFA under CPLR § 7511(b)(4) on grounds that it was the result of an unfair procedure which denied Claimants a fair opportunity to present their evidence and argument, without prior warning.

58.   "An arbitrator must give each of the parties to the dispute an adequate opportunity to

present its evidence and argument." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (vacating arbitration award on grounds of procedural unfairness). A process that does not afford a party notice and an opportunity to present relevant argument is procedurally unfair and is grounds for *vacatur* of the award. *See id.; Teamsters, Chauffeurs, Warehousemen & Helpers, Loc. Union No. 506 v. E.D. Clapp Corp.*, 551 F. Supp. 570, 578 (N.D.N.Y. 1982), aff'd sub nom. *Teamsters, Chauffers v. Ed Clapp Corp.*, 742 F.2d 1441 (2d Cir. 1983) (vacating arbitration award under 9 U.S.C. § 10(c) on grounds of refusal of arbitrator "to hear evidence pertinent and material to the controversy").

59.  "[I]t is hornbook law that arguments may not be made for the first time in a reply brief." *Browe v. CTC Corp.*, 15 F.4th 175, 191 (2d Cir. 2021) (internal quotation omitted); *see Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) ("new arguments may not be made in a reply brief"); *People v. Cornachio*, 179 A.D.3d 498, 499, 118 N.Y.S.3d 22, 24, leave to appeal denied, 34 N.Y.3d 1157, 142 N.E.3d 1153 (1st Dep't 2020) (rejecting new arguments "improperly rais[ed] . . . in [appellant's] reply brief"). Except in unusual circumstances, not applicable here, a tribunal must ignore arguments presented for the first time in reply. *See Shi Ming Chen v. Hunan Manor Enter., Inc.*, No. 17CIV802GBDGWG, 2021 WL 2282642, at *9 (S.D.N.Y. June 4, 2021) ("Inasmuch as none of this was mentioned in the original motion, we do not consider these additions."). Such unfairly tardy arguments are "forfeited." *Browe*, 15 F.4th at 191.

60.  As shown above, the parties expressly agreed that the Rule 33 Motion would adjudicate only Respondent's regulatory arguments. Nevertheless, Respondents inappropriately raised contractual arguments, for the first time, in their reply submission. Claimants had no reason to believe that the Arbitrator would consider such tardy and improper arguments—prior to any

18

Case 1:21-cv-10313-MKV   Document 13   Filed 12/24/21   Page 19 of 20

discovery, when many of the relevant facts are exclusively within the possession of Respondent, Canaccord and BFI—without notice and an opportunity to be heard.

61.    To the extent that the Arbitrator mistakenly believed there were grounds to effectively grant summary judgment based on the language of the Referral Agreement, the Arbitrator should have followed a procedure akin to that in CPLR § 3211(c) and afforded Claimants notice of its intent to convert the motion and an opportunity to be heard. *See* N.Y. C.P.L.R. 3211 (McKinney 2021) (stating that the court, "after adequate notice to the parties, may treat the motion as a motion for summary judgment"). As shown above, even without discovery, Claimants at a minimum have established triable issues of fact concerning whether—by introducing Sharpe in the First Transaction—they referred the source of the Second Transaction. In any case, under the principle set forth in CPLR § 3211(e), the Arbitrator should not have granted a motion for summary judgment prior to discovery where the material facts were exclusively in the possession of Respondent, Canaccord and BFI.

62.    Accordingly, the Court should vacate the PFA on the additional grounds that it was the result of an unfair procedure which denied Claimants a fair opportunity to present its evidence and argument, in violation of CPLR § 7511(b)(4).

**D.    The Court Should Modify the Partial Final Award CPLR § 7511(c)(2)**

63.    Alternatively, the Court should modify the PFA under § 7511(c)(2). As shown above, in deciding the Rule 33 Motion other than on regulatory grounds, the Arbitrator plainly awarded upon a matter not properly submitted to him. At this stage, the PFA may easily be corrected without affecting the merits of the Arbitration going forward. The Court may simply remand the matter back to the arbitrator with instructions to allow discovery and adjudicate all matters—after a hearing—in a complete final award coextensive with all of the issues submitted by the parties.

19

**WHEREFORE**, Petitioners respectfully request that the Court vacate the PFA and remand to the Arbitrator for further proceedings consistent with its order.

DATED:   New York, New York
November 2, 2021

Respectfully submitted,

PRESS KORAL LLP

By: _Matthew J. Press_
Matthew J. Press
Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 922-1111
Facsimile: (347) 342-3882
mpress@presskoral.com

_Attorneys for Petitioners_

20